BROWN, RESPONDENT, *v.* GRENZ, APPELLANT.

No. 9147

Submitted March 23, 1953. Decided May 22, 1953.

257 Pac. (2d) 246.

Mr. Hugh J. Lemire, Miles City, for appellant.
Messrs. Farr & Colgrove, Miles City, for respondent.
Mr. Lemire and Mr. Roland V. Colgrove argued orally.

MR. JUSTICE FREEBOURN:

This is a civil action for damages, actual and exemplary, for assault upon and unlawful eviction of, plaintiff and respondent, Loreinia H. Brown, by defendant and appellant, Chris Grenz, from premises known as the Alta Club, in Custer County, Montana, wherein plaintiff was awarded a verdict and given a judgment, from which judgment defendant appeals.

By virtue of a written lease running from January 1, 1949,

to June 30, 1950, Grenz placed Mrs. Brown in possession of the Alta Club, a nightclub near Miles City, Montana, with certain furnishings therein, for which Mrs. Brown was to pay a monthly rental of $500.

On March 29, 1950, Grenz, pursuant to R. C. M. 1947, sec. 93-9703, defining unlawful detainer, served Mrs. Brown with a "notice to vacate" the Alta Club, asserting therein that Mrs. Brown was in default of two months' rental amounting to $1,000, and demanding possession of such premises.

Grenz's next move, in order that he stay within the law, should have been the filing of a complaint against Mrs. Brown, in the proper court, as provided for by R. C. M. 1947, sec. 93-9708. Grenz, however, elected not to follow or stay within the law, and on March 31, 1950, commenced a course of action and conduct which had as its object the forcing of Mrs. Brown from the Alta Club, and which resulted in this lawsuit and appeal.

The jury could have found from plaintiff's testimony: That Grenz, about March 31, 1950, over Mrs. Brown's protest, removed certain slot machines from the Alta Club, which were part of the furnishings leased; that a day or so later, without Mrs. Brown's knowledge or consent, he chained and padlocked the front door and entrance of the club; that he set burning "bombs or candles" giving off strong, discomforting fumes, stench and smoke throughout the club building and in Mrs. Brown's living quarters in the basement, saying, "I am fumigating you rats out of here"; that he pointed a small, gunlike object at Mrs. Brown, which emitted fumes and smoke, burning her face, causing her to cough, and, as she put it, "They cut your lungs out and your eyes and you can't breathe"; that about the same time Grenz "told me he was running me out of there."

According to Mrs. Brown, at a late hour, on the next evening, Saturday, while the club was crowded, Grenz had two men "slap" purex, turpentine and white paint over all of the small entrance way and front door of the club, causing an "obnoxious

and terrific odor'' to invade the place; that the white paint was tracked onto the club floor and "two or three ladies came in with fur coats covered with paint. * * You couldn't walk in or out. My rugs and everything were covered this time.''

On the same night Grenz parked his Chrysler car from eleven o'clock p. m. until closing time "right up against the front door" so no one could get in or out of the club's front entrance; and he chained and padlocked the front door on the next day, Sunday, about six o'clock in the evening.

As testified by Mrs. Brown, while she was in Great Falls, Grenz broke into her living quarters and tossed "all my own belongings, my hats, my linens, dresses, everything that I had * * * suits, socks, shoes, underwear, hats, anything a lady would wear * * * my fur coat * * * bedding and linens, sheets and pillow cases" out into the mud and rain, where she found them on her return from Great Falls. Gone also were the bed and mattress she slept upon, as well as her blankets and pillows. Only the bed stead remained. The drawers of the chiffoniers "were all emptied.'' The deep freeze, silverware, juke box, whiskey and vacuum cleaner were taken.

When asked why he threw her things out, Grenz said to Mrs. Brown, "Because I didn't want them in there. * * * I'm throwing you out of here.''

Blanche Whitemoon, better known as Granny, a venerable lady of distinction in her own right, "born and raised in Custer County when it was a military post," although not on the Alta Club first team, was major domo of the "scrubs.'' "They call me Buckskin Ethel," she confifed to the court and jury, "but I use Blanche Whitemoon because I pay city taxes. * * the chief of our tribe names us and then the white man gives us a name. The Northern Cheyennes have two names.'' According to Buckskin Ethel, Grenz told Mrs. Brown, " 'I am going to take these machines,' and she said, 'No, you ain't, Chris.' He drew back his right hand and he said, 'You get away here you son-of-a-bitch or I'll knock you through the wall,' and she backed up and run over where I was standing. * * * I reached

and grabbed my butcher knife and I looked around and she kind of run behind me, and Mr. Chris, there he sets at the end of the table, still had his fist drawn up, and he called us both dirty names and out he went with the machines."

It was Buckskin Ethel who "went out and picked up what silks I could pick up and the fur coat out of the mud and drug it up to the side of the house. * * * There was no door on the bedroom. That door was all broken—taken off, and I looked into where I had made the bed before I left and there was nothing left but just what we call, in the Indian way, 'a foot of the bed and the stays.' There was no bed clothes or nothing on it. * * * I stopped by the door and wiped my eyes and held the soap and butcher knife in my hand and * * * all at once something went boom, just like a kid would shoot a firecracker and it was an awful odor."

Buckskin Ethel, soap in one hand and butcher knife in the other, may have eased an otherwise explosive situation, for Grenz then came to her and said, " 'Granny, you and I have never had no trouble and we never will,' and I said, 'Mr. Grenz, if I had my money I would go down the road.' "

Before the trial Grenz seemingly suspected Buckskin Ethel of having four steel chairs, which belonged to him, and he approached her on the subject. "He said, 'If they subpoena you, don't you know nothing. If they subpoena you, you have got to go, but don't you know nothing.' I looked at him and I got mad and * * walked away * * * I would like Chris to tell me the names of the young men that told him I had his four chairs."

Grenz admitted the taking of the slot machines, dishes, deep freeze, juke box, and other furnishings. He admitted throwing some things out, and the padlocking of the front door. He admitted having the front entrance painted at "ten o'clock at night * * * with the place in operation * * * Q. And when you parked your car up in front of that door, that likewise was difficult for people to get in and out? A. That was why I parked it there." He was referring to Mrs. Brown, among others, when he stated he was "fumigating to get the rats out

of there * * * and if she hadn't been in default of her rent" he would not have padlocked the place.

Where the right to possession of real property is in dispute, the owners thereof may not take the law into their own hands and proceed by violence to take possession thereof. In order to secure such possession, resort must be had to the peaceful process of law. Herzog v. The Texas Company, 88 Mont. 580, 294 Pac. 962. See: Sheehy v. Flaherty, 8 Mont. 365, 20 Pac. 687; Spellman v. Rhode, 33 Mont. 21, 81 Pac. 395.

Plaintiff's action was one in tort and is based upon the well-known principle of law that a tenant in possession has the right to such possession against the world during the continuance of his lease, and may maintain an action for damages for the disturbance or deprivation of such possession. Harris v. Keehn, 25 N. M. 447, 184 Pac. 527, 7 A. L. R. 1099, 1104, 1105. See: Quong v. McEvoy, 70 Mont. 99, 224 Pac. 266; Herzog v. The Texas Company, supra.

In committing the acts as shown by the evidence which resulted in Mrs. Brown being compelled to give up possession of and leave the Alta Club, Grenz was guilty of an unlawful eviction for which Mrs. Brown had a cause of action for damages. Quong v. McEvoy, supra; 52 C. J. S., Landlord & Tenant, sec. 450, pp. 168, 169.

Nor is there any doubt but what Grenz, in committing the acts which resulted in Mrs. Brown's eviction, was motivated by a desire to vex, injure and annoy her. Such acts were, therefore, done maliciously. R. C. M. 1947, sec. 19-103, subd. 18. The award by the jury for exemplary damages was thereby justified. R. C. M. 1947, sec. 17-208.

Appellant contends that the verdict as first returned by the jury should have been accepted, and that since no actual damage was assessed therein, the verdict for exemplary damages could not stand. This verdict found "actual damages in the sum of $ none," and assessed exemplary damages "in the sum of $5,000.00."

The trial judge, showing an abundance of caution, sent the

jury back with the admonition, "It's necessary to find, if you find anything at all, you have to find some actual damages before you can find punitive damages, so you will have to retire again * * *" The court properly admonished the jury, R. C. M. 1947, sec. 93-5111, and the jury, in addition to the exemplary damages assessed actual damages in the sum of $200.00.

The first verdict would have stood and supported a judgment. Where, as here, actual damages appear from the evidence, an award of punitive or exemplary damages will stand, though the verdict of the jury shows no finding of actual damages. Fauver v. Wilkoske, 123 Mont. 228, 211 Pac. (2d) 420, 17 A. L. R. (2d) 518; Welsh v. Pritchard, 125 Mont. 517, 241 Pac. (2d) 816.

Appellant contends that the trial court erred in refusing to give offered instructions Nos. 5, 6, and 7. The giving of these instructions would have authorized the eviction of respondent because she had no beer and whiskey licenses, United States Revenue agents having seized them for unpaid taxes, and because she had no slot machine licenses, they not having been issued by state authorities, although the money therefor had been paid.

The court did not err in refusing these instructions. Whether respondent conducted the operation of slot machines or sold beer and liquor without a license "was peculiarly a matter between * * * the state" and respondent. Quong v. McEvoy, supra [70 Mont. 99, 224 Pac. 268].

We have examined the other assignments of error and find no merit therein.

For the reasons stated the judgment of the district court is affirmed.

MR. CHIEF JUSTICE ADAIR, and ASSOCIATE JUSTICES BOTTOMLY, ANGSTMAN and ANDERSON concur.