No. 81-37

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

JOHN J. LIPINSKI,

Plaintiff and Respondent,

vs.

THE TITLE INSURANCE COMPANY, an Idaho
Corporation, and FLATHEAD COUNTY TITLE
COMPANY, a Montana Corporation,

Defendants and Appellants.

Appeal from: District Court of the Eleventh Judicial District,
In and for the County of Flathead
Honorable Robert Sykes, Judge presiding.

Counsel of Record:

For Appellants:

Richard DeJana argued, Kalispell, Montana

For Respondent:

Jonkel and Kemmis, Missoula, Montana
Daniel Kemmis argued, Missoula, Montana

Submitted: May 14, 1982

Decided: December 23, 1982

Filed: DEC 23 1982

Thomas J. Kearney
Clerk

Mr. Justice Daniel J. Shea delivered the Opinion of the Court.

The defendant title insurance companies appeal a judgment of the Flathead County District Court in which they were found liable to Lipinski for damages caused by their failure to determine and disclose certain ditch rights easements, and because they failed to defend Lipinski in lawsuits brought as a result of those undisclosed rights. Three lawsuits were brought against Lipinski. The insurance companies defended the first lawsuit under a reservation of rights, and eventually contributed $2,500 to settle that lawsuit (referred to as the Maris settlement). Later, two more lawsuits were filed against Lipinski and the title companies refused to defend both lawsuits. Lipinski sued the title companies for damages arising from the existence of the undisclosed easements, and for punitive damages because the title companies were in bad faith in refusing to defend the lawsuits. We affirm in part, reverse in part, and remand for further proceedings.

Although the issues raised by the title companies are rambling and disjointed, it appears that their appeal centers on three areas of the trial court's judgment. The first area concerns the trial court's ruling that the title companies were liable to Lipinski up to the face amount of the policy for their failure to discover and disclose, or insure against, the existence of the easements. Lipinski paid $46,000 to purchase the easement rights, and the trial court held that the amount paid to remove the defect was the measure of damages. The trial court therefore awarded the damages up to the face amount of the policy, $25,000. The title companies pose three arguments as to why Lipinski is not entitled to damages. We affirm except that we hold that $2,500 paid the

-2-

title companies to settle the _Maris_ lawsuit must be deducted from the amount ordered to be paid.

The second area of appeal concerns the trial court's assessment of $15,000 punitive damages against the title companies for their refusal to defend two lawsuits against Lipinski--referred to as _O'Neil I_ and _O'Neil II_. The title companies argue in effect that punitive damages cannot be imposed against an insurance company based on findings and conclusions that the companies were in bad faith in refusing to defend Lipinski. The title companies further argue that punitive damages could not be imposed because the trial court failed to find any actual damages, incurred by Lipinski, that were separate from the costs incurred in defending the lawsuits caused by their breach of a contract to defend. The trial court awarded a lump sum of $15,000 for refusal to defend _O'Neil I_ and _O'Neil II_. We hold that the title companies had only a duty to defend _O'Neil I_, and because the damages were not assessed separately, we remand for a redetermination of punitive damages for refusal to defend _O'Neil I_. We further hold that Lipinski can recover his costs incurred for defending _O'Neil I_ and that he cannot recover his costs incurred for defending _O'Neil II_, which defense was occasioned by Lipinski's own refusal to abide by a settlement he reached in _O'Neil I_.

The third area of damages concerns prejudgment interest awarded on costs incurred to defend _O'Neil I_ and _O'Neil II_, and surveying and engineering costs incurred in defending _O'Neil I_ and _O'Neil II_. The trial court awarded prejudgment interest at the rate of 10 percent per annum, and the title companies argue that 6 percent per annum is the proper interest rate. Lipinski concedes error on this issue. Because we have held that costs incurred in defending _O'Neil_

II are not recoverable, we remand for a redetermination of interest on costs incurred in defending O'Neil I only.

The trial courts also awarded costs for surveying and engineering expenses incurred in defending O'Neil I and O'Neil II--the costs were not apportioned by the trial court in its findings or in its judgment. Because no costs are recoverable for defending O'Neil II, we remand for a determination of the survey and engineering costs incurred for defending O'Neil I only.

The chain of events leading to this appeal started in 1961 when Lipinski purchased land near Kalispell for $25,000. Before buying the land, Lipinski had the property surveyed. He knew there were irrigation ditches on the property and that one of them, known as the "Grieg" ditch, had been repaired recently, but he did not know that easements accompanied the ditches. He began building a home on the land. Before the title companies issued him a title policy in February 1963, he knew that a neighbor was using the "Grieg" ditch which passed through his land. The neighbor, Jack Maris, was leasing the adjoining property and asked to enter on Lipinski's land to maintain the ditches. Lipinski denied him access and relied on the title policy which showed no easements. This resulted in Maris bringing suit against Lipinski for interference with the easement.

The lawsuit was settled for $6,000, with the title companies paying $2,500 of their total $25,000 exposure, and with Lipinski paying $3,500.

Shortly after the Maris settlement, O'Neil, the owner of the adjoining property, filed suit against Lipinski for interference with his easement rights and for other relief. Lipinski requested the title companies to defend him but

-4-

they refused to do so. Lipinski hired his own counsel and eventually the O'Neil suit was settled, although not for long. Lipinski refused to abide by the settlement agreement and O'Neil again sued Lipinski, this time for specific performance. Lipinski again asked the title companies to defend the lawsuit but they refused to do so.

The trial court granted specific performance in O'Neil II, and this Court affirmed. O'Neil v. Lipinski (1977), 173 Mont. 332, 567 P.2d 909. After remand, Lipinski and O'Neil, rather than proceed with the terms of the specific performance agreement, agreed that Lipinski would purchase O'Neil's ditch rights for $46,000 and the O'Neil's would quitclaim their interest in the ditch rights to Lipinski. The parties performed this agreement.

The present litigation involves Lipinski's suit against the title companies and the resulting judgment against the title companies. Part of the lawsuit involves the language of an agreement between the title companies and Lipinski when the Maris suit was settled. Paragraph two of that agreement stated:

> "2. That the second parties [the title companies] shall not be liable for any claim or claims brought directly by first party [Lipinski] as a result of the presence of either of the two ditches on his lands, which ditches were the subject of the above referred to lawsuit."

Lipinski signed this agreement and sent it back to the title companies. Before signing the agreement, however, the title companies inserted the phrase "see insert below" next to paragraph two and then placed the following insertion underneath the signatures:

> "Insert: 'except that the payment hereunder by the [title companies] shall be deemed to be in full compensation for any reduction in the value of the insured property of . . . [Lipinski] caused by the existence of the two ditches thereon.'"

-5-

Lipinski's title policy obligated the title companies to defend Lipinski at their own cost in any litigation ". . . founded upon a defect, lien, encumbrance, or other matter insured against by this policy." In checking the records before issuing the policy, the title companies failed to find, or note on the policy, that a 1944 warranty deed existed in Lipinski's chain of title which contained the recital: ". . . subject to rights established by irrigation ditch . . ." the Maris lawsuit and the O'Neil lawsuits were based on an underlying easement relating to the irrigation ditch and the rights of the owner of the easement to maintain and repair the irrigation ditch.

The first O'Neil suit was based on contentions that Lipinski had wrongfully interfered with the O'Neil's primary easement to transport water across Lipinski's lands and a secondary easement to maintain a dam and two irrigation ditches. The title companies refused to defend Lipinski in that action. We hold that the title companies were obligated to defend Lipinski. The second O'Neil suit, however, was brought to enforce the agreement reached between O'Neil and Lipinski to settle the first suit. We hold that the title companies were not obligated to defend that lawsuit because Lipinski invited this lawsuit by refusing to abide by the settlement terms of the first O'Neil suit.

As we have previously stated, the trial court found that Lipinski had been damaged in the amount of $46,000 (the amount he paid to buy the easement rights from O'Neil), but limited recovery to the face amount of the policy--$25,000. The court further ruled that the title companies' refusal to defend O'Neil I and O'Neil II was both a breach of contract and an act of bad faith. The court held that the refusal to

defend "was an act done without justification, was willful, malicious, oppressive, and constituted bad faith on the part of the defendants." The court assessed $15,000 punitive damages against the title companies. The trial court also awarded Lipinski his costs incurred for defending O'Neil I and O'Neil II, including attorney fees, survey and engineering expenses, and prejudgment interest on these amounts from the time the costs were incurred.

EFFECT OF THE FAILURE TO DISCOVER THE EASEMENTS:

The title companies argue that under the policy terms they had no duty to discover the ditch right easements. First, they argue that the easements were not of record and therefore they should not be held responsible for reporting their existence to Lipinski. Second, they argue that the title insurance contract expressly excludes water rights, that the basis of the easement is an underlying water right, and therefore that coverage is precluded. Third, they argue that Lipinski had or should have had personal knowledge of the easements and his failure to report them to the title insurance companies should preclude his right to recover.

A 1944 warranty deed in Lipinski's chain of title recited that the grant was "subject to rights established by irrigation ditch." The question is whether this recital put the title companies sufficiently on notice that a duty was imposed to further determine the nature of that right recited in the deed. The policy expressly excludes coverage for ". . . easements . . . not shown by the public records . . . ." Because the warranty deed recital did not state that an easement existed, the title companies argue that the policy does not insure against that undisclosed easement.

We hold, however, that the ditch rights were sufficiently mentioned in the recorded 1944 warranty deed to put the title companies on notice that there might also be easements accompanying those ditch rights. These possibilities should have been brought to Lipinski's attention and either specifically insured or specifically excluded from insurance coverage.

Nor do we agree that coverage should be denied because the basis of the easement was an underlying water right specifically excluded by the policy. Lipinski did not claim damages and damages were not awarded because of the existence of an undisclosed water right, but rather for the existence of an undisclosed easement accompanying those water rights. The existence of the ditch rights--here accompanied by easements--is necessarily derived from the existence of the water rights, and findings and conclusions concerning those water rights could hardly be avoided. The trial court, however, awarded damages because there was sufficient notice of possible ditch rights--accompanied by easements--which the title companies should have, but did not, call to Lipinski's attention.

The title companies next argue that Lipinski should be denied recovery under the policy because he had actual knowledge of the easements sufficient to require him to bring it to the title companies' attention or be excluded from coverage. Lipinski admitted knowledge of the existence of the ditches, but he denied having any knowledge that anyone had a right to enter upon his land. He stated that he relied on the title report to tell him whether anyone had such a right to enter his land in order to maintain the ditches. Lipinski, as a layman with no knowledge of easements, could reasonably rely on the specialized knowledge of the title insurance business to reveal and explain to him any title defects and their consequences.

Although title insurance applicants are interested in obtaining insurance coverage, their primary interest is in what the examination discloses. For this they rely on the title companies to tell them of any risks. Risks usually covered by title insurance policies include errors in the title examination, including the negligent failure to note a title defect. A title company, as insurer, owes its clients the duty of conducting a title search with reasonable care. Although liability does not attach for failure to discover defects which cannot be discovered with reasonable care, here a title examiner conducting a title search should have been alerted to the possible consequences of the recital in the 1944 warranty deed. An examination of the premises should have revealed the very real possibility that an easement existed to give effect to the irrigation ditch recital in the 1944 warranty deed. Examination would have revealed that water on Lipinski's property was being dammed and conducted away from his land through irrigation pipes or canals leading onto a neighbor's land. A title insurer cannot simply ignore a recital that puts it on notice of a possible defect in the title.

We hold, therefore, that the title policy covered the existence of the defects.

THE MEASURE OF DAMAGES FOR FAILURE TO DISCOVER OR DISCLOSE THE DEFECT:

The title companies advance three arguments on the question of damages caused by the existence of the easements. First, they argue that the policy covers only pecuniary loss, that Lipinski suffered only an aesthetic loss, and therefore that Lipinski cannot recover damages. Second, they argue that a provision of the Maris settlement agreement (that

-9-

agreement between the title companies and Lipinski), expressly precludes any recovery for diminution of value or any other form of recovery of damages. Third, assuming it was proper to apply a diminution of value theory, they argue that the wrong test was used in application of their theory and therefore that the damages should only be $3,557.50 at most.

In arguing that Lipinski's land sustained only an aesthetic loss as opposed to a pecuniary loss, the title companies put forth no real argument. While undoubtedly aesthetic loss was suffered, there is no question that the undisclosed ditch rights and the attendant right to enter upon and alter Lipinski's land caused Lipinski to suffer a substantial pecuniary loss. We note, furthermore, that the title companies, in making its aesthetic damages argument, assume that the trial court awarded damages based on a reduction in value. Although there was evidence that the value of the land was reduced by $55,000 because of the existence of the easements, the fact ignored by the title companies is that the trial court awarded damages based not on a reduction of value, but on what it cost Lipinski to remove the title defects. Lipinski paid $46,000 to O'Neil to remove the title defects (he purchased O'Neil's easement rights), and the trial court established $46,000 as the amount of the loss.

The title companies next argue that the _Maris_ settlement agreement (the agreement between the title companies and Lipinski) precludes recovery for diminution of value of Lipinski's property caused by the existence of the easements. They rely on paragraph two of the _Maris_ settlement agreement that the title companies ". . . shall not be liable for any claim or claims brought directly by [Lipinski] as a result

-10-

of the presence of either of the two ditches on his lands, which ditches were the subject of the . . . [Maris] lawsuit." Although the title companies tacitly acknowledge an improper alteration of the agreement by the insertion without the knowledge or consent of Lipinski, that no recovery would be permitted for "diminution of value," they argue that this alteration does nothing more than clarify paragraph two of the agreement which precludes any kind of recovery.

Lipinski argues, on the other hand, that the title companies cannot rely on paragraph two of the Maris settlement agreement because in altering the agreement without Lipinski's knowledge or consent, the title companies violated section 28-2-1703(1), MCA. That statute provides:

> "The intentional destruction, cancellation, or material alteration of a written contract by a party entitled to any benefit under it or with his consent extinguishes all the executory obligations of the contract in his favor against parties who do not consent to the act."

Applied here, this statute makes clear that if the insertion explaining or expanding on paragraph 2 was a material alteration the title companies cannot claim the benefit of the Maris settlement terms in seeking to avoid damages caused by their failure to discover the existence of the easements.

The trial court found that in refusing to defend the O'Neil lawsuits the title companies relied in part on the altered language contained in the insertion. The title companies have not appealed from that finding. Lipinski clearly suffered detriment because had the title companies not relied on the altered agreement they may have defended him in the first O'Neil suit. Instead, the title companies refused to defend and Lipinski was forced to hire counsel and to pay the costs of litigation. We therefore hold that the title companies had no right to avail themselves of

-11-

paragraph two of the _Maris_ settlement agreement in an attempt to avoid paying damages caused by their failure to discover the easements.

We further question, although we do not expressly rule, whether the title companies could, after issuing the policy to Lipinski, contract with Lipinski to take away the coverage already bargained for—the $25,000 limits. Settlement of the _Maris_ case, with or without a reservation of rights, should not have affected Lipinski's rights to assert his rights against the title companies for damages sustained because of their failure to discover the easements. In essence, the title companies' agreement with Lipinski was that it would contribute to the _Maris_ settlement only if Lipinski gave up his rights under the policy to recover damages by the title companies' failure to discover the easements. This agreement may well contravene public policy.

Third and finally, in an argument which assumes the right to recover for diminution of damages, the title companies devote seven pages of their brief explaining that the trial court found the wrong amount. They contend Lipinski would be permitted to recover $3,577.50 at most. Lipinski, on the other hand, devotes several pages of his brief to explaining why he should be able to recover for diminution of value to his property and why the amount set by the trial court is proper. Neither the title company nor Lipinski cite any authority. However, both parties have missed the basis of the trial court's decision awarding damages caused by non-disclosure of the easement: the trial court ruled that the measure of damages for an undisclosed easement should be "the amount required to remove such defect."

The posture of this case on appeal, therefore, is that the measure of damages formula adopted by the trial court has not been appealed. We further note that the trial court had a legal basis for this decision. In a situation where a partial loss has resulted from an encumbrance or encroachment, courts have adopted three tests for the measure of damages. One of those tests is "the amount necessary to remove the existing encumbrance or lien." 44 Am.Jur.2d Insurance § 1566 at 573. Whether it was the proper measure of loss in this case is an issue that has not been appealed and we therefore affirm the measure of damages adopted.

THE IMPOSITION OF PUNITIVE DAMAGES:

The title companies attack the imposition of punitive damages on two grounds. First, they argue that punitive damages cannot be imposed where the underlying cause has been a breach of contract. Second, they argue that because no actual damages were found because of their act of bad faith, there was no basis to impose punitive damages.

The trial court found that the refusal of the title companies to defend O'Neil I and O'Neil II was not only a breach of contract but also was an act of bad faith. Specifically, the trial court found that the refusal was:

> "a breach of contract which sustains the award
> of actual damages [and that the] refusal to
> defend was an act done without justification,
> was willful, malicious, oppressive, and con-
> stituted bad faith." (Emphasis added.)

Based on this conclusion, the trial court ordered the title companies to pay $15,000 punitive damages to Lipinski.

The title companies have not challenged the evidence on which the trial court based its decision to impose punitive damages. Rather, they argue that punitive damages were imposed for a breach of contract and that section 27-1-221,

-13-

MCA, prohibits imposition of punitive damages arising from a breach of contract. That statute provides:

"In any action <u>for</u> a <u>breach</u> <u>of</u> an <u>obligation</u> <u>not</u> <u>arising</u> <u>from</u> <u>contract</u> where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant." (Emphasis added.)

The title companies argue that if there had been no contract there would have been no breach, and therefore section 27-1-221, MCA, prohibits the assessment of punitive damages.

The title companies concede that punitive damages can be awarded to an insured for breach of duty owed to its insured, but they argue that it can only be done where, independent of its contract, the insurance company has violated a provision of the insurance code. Because no insurance code violation exists here they argue therefore that punitive damages cannot be imposed. But this Court has never held that punitive damages can be imposed against an insurance company only if it has violated a provision of the insurance code. The trial court held that the title companies, in refusing to defend Lipinski, acted in bad faith. We hold that this is a basis, independent of contract, and independent of the insurance code, on which punitive damages can properly be assessed.

In seeking to distinguish First Security Bank v. Goddard (1979), 181 Mont. 407, 593 P.2d 1040, the title companies fail to meet the issue of whether they have an independent duty of good faith in dealings with their insureds. In Goddard, we stated: "It is the breach of the statutory requirement, a duty independent of the insurance contract, that gives rise to that liability <u>in</u> <u>the</u> <u>case</u> <u>at</u> <u>bar</u>." 593

-14-

P.2d at 1047. (Emphasis added.) From this holding the title companies jump to the unsupportable conclusion that punitive damages can only be assessed against an insurance company where, aside from a contract breach, there has been a violation of the insurance code. But that is not our holding in Goddard. In fact, we clearly sent a message in Goddard that an insurer may well have a duty independent of contract, and independent of statute, to act in good faith with its insureds. 593 P.2d at 1047. Further we held in Weber v. Blue Cross of Montana (1982), ___ Mont. ___, 643 P.2d 198, 39 St.Rep. 245, that Blue Cross, technically not an insurance company under the majority analysis, had a duty of acting in good faith with those for whom it provided coverage. 643 P.2d at 203, 39 St.Rep. at 252. It would be more than anomalous to now hold that insurance companies do not have this duty of good faith when dealing with their insureds. Should there be any doubt, we now expressly hold that insurance companies have a duty to act in good faith with their insureds, and that this duty exists independent of the insurance contract and independent of statute. Any statements in our cases, to the extent they may be or appear to be in conflict with this holding, are expressly overruled.

The title companies' second argument is that punitive damages could not be awarded because the trial court did not find separately as a result of a prima facie tort arising from an act of bad faith that Lipinski had sustained any actual damage. Rather, the trial court found the actual damages based on a breach of the contract. The trial court's conclusion of law stated:

-15-

> "The refusal to defend . . . constituted a
> breach of contract, which sustains the award
> of actual damages granted above [the court
> allowed recovery of costs incurred in defending
> O'Neil I and O'Neil II].  In addition, said
> refusal to defend was an act done without
> justification, was willful, malicious,
> oppressive, and constituted bad faith on the
> part of the Defendants . . ."

Because the award was based on actual damages the title companies argue that punitive damages cannot be sustained because there was no actual damages flowing from the prima facie tort of bad faith.

We note first that the statute section 27-1-221, supra, does not require actual damages to flow from the commission of the tort before punitive damages can be assessed.  Nor have the title companies cited any authority for their argument.  It is true here that the trial court awarded actual damages based on a breach of contract; however, the court could as easily have held that the damages flowed from the commission of the prima facie tort of bad faith, and therefore a basis for actual damages would clearly exist from the commission of the tort.  It is likewise clear that if a basis for actual damages exists in the record, the fact that none are awarded, does not prevent the assessment of punitive damages.  Brown v. Grenz (1953), 127 Mont. 49, 257 P.2d 246.  Also see Fauver v. Wilkoske (1949), 123 Mont. 228, 211 P.2d 420.

The title companies' argument exalts form over substance. The trial court did not simply hold that the title companies had breached their contract with Lipinski; the trial court held that the title companies were in bad faith in refusing to defend Lipinski.  In other words, the title companies by the terms of the contract, had a clear duty to defend Lipinski, and in breaching that clear duty the title companies acted in

-16-

bad faith. The damages which Lipinski incurred in defending O'Neil I surely flowed from that act of bad faith. The simple fact is that there would have been no damages if the title companies had acted in good faith, for if they acted in good faith they would have defended O'Neil I and Lipinski would have incurred no costs.

Despite our holding on the issue of punitive damages, we must vacate the award and remand for a further determination of the amount of damages to be assessed. The trial court in assessing punitive damages, awarded a lump sum of $15,000 as damages for refusal to defend O'Neil I and O'Neil II. The O'Neil II lawsuit was prompted by Lipinski's failure to honor the terms of the O'Neil I settlement, and we hold that the title companies had no duty to defend that lawsuit. Accordingly, punitive damages must be assessed based on the refusal of the title companies to defend O'Neil I only.

ACTUAL DAMAGES, SURVEYING AND ENGINEERING EXPENSES, AND PREJUDGMENT INTEREST:

We have held that the title companies had no duty to defend O'Neil II, and therefore Lipinski had no right to recover for costs incurred (actual damages) in defending that action.

The court awarded surveying and engineering expenses to be paid as actual damages, but did not apportion the expenses between O'Neil I and O'Neil II. We therefore remand for a redetermination of survey and engineering expenses incurred in defending O'Neil I only.

In awarding all costs incurred for defending the actions, the trial court awarded prejudgment interest at 10 percent per annum. The title companies argue, and Lipinski concedes, that 6 percent per annum is the proper interest rate. Accordingly, we vacate that part of the judgment and remand

-17-

for a proper determination of the interest amount, to be applied only to the costs of defending O'Neil I.

The judgment of the District Court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

_____
                    Justice

We Concur:

_____
        Chief Justice

_____

_____

_____
                Justices

_____
Hon. LeRoy McKinnon,
District Judge sitting
for Mr. Justice Frank B.
Morrison

-18-

Mr. Justice Fred J. Weber concurs and dissents as follows:

Except as herein specifically mentioned, I concur in the foregoing majority opinion.

With regard to the first issue, I agree that the title insurance policy covered the existence of the ditch rights, resulting in an obligation to pay damages to Lipinski. The majority opinion states that a primary interest of a title insurance applicant is in what the examination discloses, and that applicants rely on the companies to tell them of any risks and that the risks covered by policies include errors in title examination, including negligent failure to note a title defect. The majority also states that a title company, as insurer, owes its clients the duty of conducting a title search with reasonable care, and then points out how the title examiner should even have examined the premises, concluding with the statement that a title insurer cannot ignore a recital that puts it on notice of a possible defect in title.

The relationship between the parties is determined by the title insurance policy. In this instance, the policy in pertinent part states:

> "The Title Insurance Company . . . does hereby insure John J. Lipinski . . . against loss or damage not exceeding $25,000, which the insured shall sustain by reason of:
>
> 1. Title to the land . . . being vested . . . otherwise then as herein stated; or
>
> 2. Any defect in . . . said title existing at the date hereof, not shown or referred to in Schedule B;"

Schedule B does not contain any reference to ditch rights, as mentioned in the majority opinion. The ditch rights therefore fall within the foregoing provisions of the policy. The policy provides that the company shall defend the insured in all litigation founded upon a defect, lien, encumbrance or other matter insured against by this policy. Among other

contract rights, the Company reserves the option to pay or compromise any claim or pay this policy in full at any time. Payment of the full amount of the policy "shall terminate all liability of the Company". The contract does not contain a requirement that the insurance company examine the title records nor that the insurance company in any manner examine the ground itself. I find no basis for the conclusion of the majority that there is a duty to make a title search, or that a claim of relief arises from a negligent title examination. No authority is cited for these conclusions which certainly do not arise from the title insurance policy. I would exclude such conclusions from the opinion.

_____
Justice

Mr. Chief Justice Frank I. Haswell:

I concur in the foregoing dissent of Mr. Justice Weber. The majority have created a new duty on the part of title insurance companies beyond the coverage of the title insurance policy.

_____
Chief Justice

I concur in the dissent of Mr. Justice Weber.

_____
Hon. LeROY L. McKINNON
District Judge sitting for
Mr. Justice Morrison.