**FOCUS INVESTMENT ASSOCIATES, INC., Plaintiff,**

**v.**

**AMERICAN TITLE INSURANCE COMPANY, et al., Defendants.**

**C.A. No. 89–0625B.**

United States District Court, D. Rhode Island.

June 9, 1992.

Steven E. Snow, Partridge, Snow & Hahn, Providence, R.I., for plaintiff.

Max Wistow, Wistow & Barylick Inc., Providence, R.I., for defendants.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

This action arises from a loan of $250,-000.00 to George Marderosian, a Rhode Island attorney, by the plaintiff Focus Investment Associates, Inc. ("Focus"). Focus brought this action against the title company, American Title Insurance Company ("American"), that issued the title policies in connection with the transaction. A jury returned a verdict of $49,000.00 on plaintiff's breach of contract claim and $286,000.00 on plaintiff's negligence claim. Defendant has moved for judgment notwithstanding the verdict.

### I. *Facts*

Plaintiff initiated this action in November, 1989, charging American with negligence and breach of contract, arising out of American's issuance of two title insurance policies to Focus in December, 1988. The action was tried to a jury. American moved for a directed verdict. American's motion was denied and the jury returned a verdict for Focus on both the breach of contract and the negligence claims.

Focus is an Ohio corporation engaged in the business of investing money in real estate and making loans secured by interests in real estate. On December 6, 1988, the late Laurence J. Shapiro, a Boston real estate developer and mortgage broker, solicited Focus for the placement of a $250,-000 short-term loan to George Marderosian, a Rhode Island attorney. Shapiro ex-

plained to Focus that Guardian Mortgage Corp. ("Guardian"), a loan company owned and operated by Shapiro, would make and close the loan and immediately assign all documents to Focus in return for Focus' funding and purchase of the loan. Shapiro represented that the loan would be fully secured by second mortgages on twelve condominium units valued at $1,140,000 in the aggregate, subject only to a first mortgage on the units held by Attleboro Pawtucket Savings Bank. The Attleboro Pawtucket note had an approximate principal balance of $720,000. Additional security in the form of a second mortgage on Marderosian's private residence, which Shapiro represented had an equity value of $100,000 over and above a disclosed first mortgage held by The Boston Five Corporation, was also to be provided.

Focus agreed to make the loan and Marderosian's promissory note, which carried an interest rate of 20% per annum, was forwarded to it. The balance of the loan plus interest was due on April 6, 1989. On December 7, 1988, mortgages securing the loan were recorded and American, through its policy-issuing attorney, defendant Owen Landman, issued Focus two title insurance policies, insuring Focus' second mortgage position on all the mortgaged properties. Landman issued the policies without a title search. He relied on a title report supplied by Marderosian showing only a first mortgage on each of the properties. The policy for the condominium units stated that title to the units was vested in George A. Marderosian as trustee of The River's Edge Realty Trust.

Shortly after the closing, Shapiro died. Marderosian made three payments in January, February and March of 1989, totaling $23,200. The balance of the note, however, was not paid when due.

Following the default, Focus discovered that its recorded mortgages were not second mortgages. With respect to the mortgage on the twelve condominium units, Focus' mortgage was in fifth position, not second. Its mortgage on Marderosian's home was not in second position but in fourth position behind mortgages held by C

& K investments and the Bank of New England–Old Colony. In addition, title to the condominium units was vested in an entity named Capital Development Center ("CDC") and not Marderosian when Focus made the loan to him.

In July, 1989, Attleboro Pawtucket Savings Bank foreclosed on its mortgage. The condominium units were sold at foreclosure, and the sale price was less than the balance of the Attleboro Pawtucket Savings Bank debt. Shortly thereafter, C & K investments foreclosed its mortgage on the Marderosian residence. Focus sued American to recover its investment after determining that pursuit of Marderosian would be fruitless. Focus advances three negligence theories: 1) the duty of a title insurance company to search title and disclose liens of record; 2) negligent misrepresentation and 3) negligent hiring, retention and supervision of policy-issuing attorneys.

Focus also sued under a breach of contract theory for American's refusal to pay its actual losses pursuant to the policy.

The jury awarded $49,000 on the breach of contract claim and $286,000 on the negligence claim. American now moves for judgment notwithstanding the verdict.

## II. *Judgment n.o.v. Standard*

The standard for judgment n.o.v. is well settled. The evidence must be viewed in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor without making credibility determinations, resolving conflicting testimony or weighing the sufficiency of the evidence. *Higgins v. Hazen Paper Company, et al.*, 953 F.2d 1405, 1409 (1st Cir.1992). It must then be determined whether a reasonable jury could draw different inferences and reasonably disagree as to what the verdict should be. *Id.* If reasonable minds could differ as to the verdict, the jury's verdict cannot be set aside. *Id.* Here, the evidence and the law do not support the jury's verdict on the negligence claims, but the verdict regarding the breach of contract claim is supported by the evidence.

### III. *Negligence Claims*

Plaintiff alleges that American should be held vicariously liable for Landman's negligence in the performance of his task as American's policy-issuing attorney. Plaintiff further claims that American is liable under the theory of negligent misrepresentation and for the negligent hiring, retention and supervision of Landman.

### A. Agency

■ American is liable for Landman's failure to conduct a title search prior to issuing a title insurance policy to Focus, only if he acted as American's agent. An agency exists where one party agrees to act on behalf of another, subject to that other's consent and control. Restatement (second) Agency § 1(1) (1958). There are three components which must co-exist in order to establish an agency relationship: "(1) a manifestation by the principal that the agent will act for him, (2) acceptance by the agent of the undertaking, and (3) an agreement between the parties that the principal will be in control of the undertaking." *Lawrence v. Anheuser–Bush, Inc.*, 523 A.2d 864, 867 (R.I.1987) (quoting Restatement (second) Agency § 1(1) (1958)).

On April 28, 1980, American appointed Landman to serve as its policy-issuing attorney in Rhode Island. The relationship was governed by a written contractual agreement. The agreement provided that American would provide Landman with all necessary forms for writing title insurance policies, and Landman was to notify American of all policies written by him. Additionally, the agreement provided that Landman was to be paid a 60 percent commission on each policy he issued. Landman's policy-issuing authority was limited to policies of $500,000 or less. Insurance policies for amounts greater than $500,000 required American's approval. The agreement required Landman to keep certain records and it gave American the power to review those records. Finally, the agreement was terminable upon written notice by either party. Although the agreement specifies certain terms and conditions regulating the issuance of title insurance poli-

cies, there is nothing in it which establishes the necessary indicia of an agency relationship, especially the element of control.

■ In order for an agency relationship to exist, it is essential that the employer retain the right to control the performance of the employee. *Lawrence*, 523 A.2d at 867. Here, provided Landman acted within the limits of his contractual agreement, his performance was not controlled by American. Landman was free to determine whether a title policy should issue in a particular instance based on information gathered and interpreted at his discretion without any input or control from American. The manner or means of reaching this conclusion was not directed or dictated by American. The facts clearly admit of no conclusion other than that Landman functioned as an independent contractor.

■ An employer-independent contractor relationship exists where one is retained to perform a task independent of and not subject to the control of the employer. See 41 Am.Jur.2d *Independent Contractors* § 1, at 737 (1968). An employer is not generally liable for the negligent acts of its independent contractor. *Webbier v. Thoroughbred Racing Protective Bureau, Inc.*, 105 R.I. 605, 611, 254 A.2d 285 (1969). Although Landman may have been negligent in issuing a title policy without conducting a title search, his negligence does not impose vicarious liability upon American. Additionally, even if Landman was not an independent contractor, Focus may not recover under a negligence theory based on Landman's failure to search title because, as hereafter demonstrated, there was no duty to search title.

### B. Duty to Search Title

■ Plaintiff argues that American, through its policy-issuing attorney, Owen Landman, had a duty to conduct a title search prior to issuing a policy of title insurance. Focus claims that had American made it aware of all other superior mortgages, it would not have loaned Marderosian $250,000. Whether there is a duty to conduct a title search and disclose any reasonably discoverable information

that might affect the insured's decision to act as a mortgagee is an issue of first impression in Rhode Island.

Many jurisdictions have held a title insurer liable for a negligent search where the insurer expressly contracted to perform the function of an abstractor. *See, e.g., Red Lobster Inns v. Lawyers Title Ins. Co.*, 656 F.2d 381 (8th Cir.1981); *Dorr v. Massachusetts Title Ins. Co.*, 238 Mass. 490, 131 N.E. 191 (1921).

Furthermore, a title insurer may be liable for negligently conducting a title search where the insurer was required to provide the insured with a preliminary title report in addition to an insurance policy. *See, e.g., White v. Western Title Ins. Co.*[1], 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309 (1985). *Heyd v. Chicago Title Ins. Co.*, 218 Neb. 296, 354 N.W.2d 154 (1984); *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 553 P.2d 254 (1976). In *Ford* the court reasoned that

> [w]here a title insurer presents a buyer with both a preliminary title report and a policy of title insurance two distinct responsibilities are assumed; in rendering the first service, the insurer serves as an abstractor of title and must list all matters of public record regarding the subject property in its preliminary report. When a title insurer breaches its duty to abstract title accurately it may be liable in tort for all the damages proximately caused by such breach. [Citations omitted]

553 P.2d at 266.

Other jurisdictions have declined to hold a title insurer liable for a negligent search even where the insurer issued a preliminary report in addition to an insurance policy. See *Culp Const. Co. v. Buildmart Mall*, 795 P.2d 650 (Utah 1990); *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 562 A.2d 208, 217–21 (1989) (holding that title company not liable for negligent conduct of title search unless title company agrees to act as abstractor of title and provide insured with an abstract

of title); *Anderson v. Title Ins. Co.*, 103 Idaho 875, 879, 655 P.2d 82, 86 (1982) ("refus[ing] to impose the liabilities of an abstractor upon a title insurance company merely because it issued a preliminary title report"); *Horn v. Lawyers Title Insurance Corp.*, 89 N.M. 709, 557 P.2d 206, 208 (1976) (holding that "[d]efendant clearly had no duty under the policy to search the records, and any search undertaken, was undertaken solely for its own protection as indemnitor against losses covered by its policy").

Additionally, some jurisdictions have declined to hold a title insurer liable for a negligent search even where a state statute mandates that insurers conduct a title search prior to issuing a policy. *See Culp*, 795 P.2d at 654; *Walker*, 562 A.2d at 218; *Brown's Tie & Lumber Co. v. Chicago Title Co. of Idaho*, 115 Idaho 56, 764 P.2d 423 (1988). The basis of these decisions has been that the statutes do not impose on the insurer a duty to conduct a reasonable search. *Walker*, 562 A.2d at 219. There is a reluctance to look beyond the terms of the insurance policy to determine the rights and duties of the parties. *Walker*, 562 A.2d at 219–20.

Some jurisdictions have stated in dicta that title insurers have a duty to conduct a reasonable search prior to issuing a policy, however, these jurisdictions limit recovery to the face amount of the policy. *See, e.g., Lipinski v. Title Ins. Co.*, 202 Mont. 1, 655 P.2d 970, 972 (1982) (holding plaintiff entitled to $25,000 in damages, the face amount of his title insurance policy, where plaintiff suffered $46,000 in damages due to existence of undisclosed easement which reasonable search would have identified).

American did not expressly contract to provide Focus with a title report, nor was Focus given a preliminary report of title in conjunction with its title policy. Since liability was not premised, in this instance, on the fact that a preliminary title report was issued prior to the title insurance policy, the holdings of *White, Heyd* and *Ford* do

---

**1.** It should be noted that the *White* decision was abrogated by the California legislature. Cal.In-

surance Code § 12340.11 (West 1988).

not apply here. Furthermore, the *White* and *Ford* courts drew a sharp distinction between a title insurer's duties as a drafter of a preliminary title report and its duties as an insurer, it is unlikely, using the reasoning of these cases, that liability would be imposed on an insurer merely because of representations contained in an insurance policy.

Title insurance policies are generally agreements which provide indemnification for an actual loss. *Falmouth Nat. Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1062–63 (1st Cir.1990). The title company agrees to reimburse the insured for the actual loss sustained. Plaintiff's theories seek to convert the relationship of the parties to a guarantee relationship whereby the Title Company would assure that the insured would suffer no loss in the transaction. It is not only the overwhelming majority view but the eminently sensible position that title policies do not guarantee clear title. These policies only protect against loss if there is later found to be a title defect. It is the lender in this real estate mortgage transaction who undertook the responsibility of searching title. The lender in this instance did not pay for and did not receive an opinion of title. Under the circumstances, there is no rational basis for an award of damages to plaintiff for the lack of a title search. As a matter of law American Title owed no duty to Focus to conduct a title search before issuing it a title insurance policy.

## IV. *Negligent Misrepresentation*

■ The title insurance policies issued to Focus covering the condominium units and the Marderosian residence excepted from coverage only one prior mortgage. Focus argues that this amounted to a representation that its mortgage was in second position. Focus contends that because American negligently failed to confirm the veracity of this representation, American is liable for negligent misrepresentation. American is only liable for misrepresentation if it was under a duty to perform a title search and accurately disclose all discoverable information.

■ The Rhode Island Supreme Court has recently recognized the tort of negligent misrepresentation. *Estate of Braswell by Braswell v. People's Credit Union*, 602 A.2d 510 (R.I.1992). Negligent misrepresentation occurs where

(1) One who, in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See Rusch Factors, Inc. v. Levin*, 284 F.Supp. 85 (D.R.I.1968) (citing to the tentative draft of the Restatement (second) of Torts § 552).

Having previously determined that American had no duty to search title, it, likewise, had no duty to search for and disclose existing mortgages of record in Focus' title insurance policies. It is generally not the function of a title insurer to guarantee the state of title. *Falmouth Nat. Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058 (1st Cir.1990). "Title insurance is a contract of indemnity, not one of guarantee." *Id.* at 1062 (citations omitted). "Thus, an insurer does not guarantee the state of title, but rather, agrees to indemnify the insured for any loss." *Id.* (citation omitted).

As a matter of law, Focus has no basis for a negligent misrepresentation claim against American.

### A. Negligent Hiring, Retention, and Supervision

■ The Rhode Island Supreme Court recognizes that "a person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless ... in the employment of improper persons or instrumentalities in work involving risk of harm to others." *Welsh Mfg., Div. of Textron v. Pinkerton's, Inc.*, 474 A.2d 436, 440 (R.I.1984) (quoting 1 Restatement (sec-

ond) Agency § 213(b), at 458 (1958)). An employer is not liable under this section simply because its employees are incompetent or careless. *Destefano v. Grabrian,* 763 P.2d 275, 287 (Colo.1988). Liability turns on whether the employer has taken reasonable care in selecting, training and retaining an employee. *Welsh,* 474 A.2d at 440. Here, the jury returned a general verdict, finding American Title guilty of negligence. As a result, each theory of negligence posed here must be examined.

#### i. Negligent Hiring, Retention and Training

■ Focus alleges that American was negligent in hiring Landman as a policy-issuing attorney. The evidence in this case does not support the jury's finding of negligence. There was no evidence to suggest to American Title that Landman was unfit for this position. He was a member of the Rhode Island Bar. He served as an approved attorney for other title companies whereby he conducted title searches, prepared preliminary reports, and submitted these reports to the title company for approval of insurance. In employing Landman, American eliminated this last step and allowed Landman to make the decision as to whether a title policy should issue. One would reasonably believe that an attorney with Landman's skill and expertise in the field would be capable of reviewing a title report and determining whether or not to issue a title insurance policy. Landman served as American's policy-issuing attorney from 1980–89. There is no evidence to show that Landman was otherwise incompetent in the performance of his job during that period. There is no evidence to support Focus' theory that American Title acted unreasonably in selecting and retaining Landman as its policy-issuing attorney. American is liable only if it failed to use reasonable care in hiring Landman as a policy-issuing attorney. Landman's subsequent negligence in the issuance of the Focus title policy cannot be the basis for liability on American.

Further, American's failure to provide additional training is clearly not the proximate cause of Focus' injury. Landman's negligent job performance had nothing to do with a lack of training. Rather than conducting the required title search before issuing a title policy, Landman choose to rely upon the representations of another attorney without verifying the record himself. Additional training in the proper methods of conducting a title search or the requirements for issuing a title policy would not have prevented the harm caused by Landman's carelessness.

#### ii. Negligent Supervision

■ As established previously, Landman acted as an independent contractor. An employer is not liable for the negligent acts of its independent contractor. Restatement (second) Torts § 409 (1965). Although, Rhode Island recognizes a duty to supervise and inspect the work of independent contractors who have made repairs to real property, this rule is bottomed upon those situations in which an owner or possessor of land has a nondelegable duty to keep the premise in a safe condition. *See Vucci v. Meyers Bros. Parking System, Inc.,* 494 A.2d 530, 536 (R.I.1985); *Ward v. Watson,* 524 A.2d 1108, 1109–10 (R.I.1987) (duty of tenant to keep premises in reasonably safe condition); *Casador v. First Nat. Stores, Inc.,* 478 A.2d 191, 194 n. 2 (R.I. 1984) (duty of owner/occupier of premises); *see also Ballet Fabrics v. Four Dee Realty Co., Inc.,* 112 R.I. 612, 621–22, 314 A.2d 1, 4 (1974) (citing case law recognizing exception to rule of employer non-liability for torts of independent contractor); Restatement (second) Torts §§ 410–429 (1965) (exceptions to employer non-liability for torts of independent contractor). There is nothing to suggest in Rhode Island law a requirement of supervision or inspection of independent contractors in other circumstances. American had no duty to supervise Landman's performance.

Viewing the evidence in the light most favorable to the plaintiff, the jury could not have reasonably found American liable under any of the negligence theories raised. Consequently, the jury's verdict finding American liable in negligence cannot stand,

and the defendant's motion for judgment n.o.v. must be granted.

## V. *Breach of Contract*

■ The jury found American liable for breach of contract. American argues that this claim was barred by *Falmouth Nat. Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058 (1st Cir.1990), and should not have gone to the jury. American now seeks a judgment n.o.v.

In *Falmouth* the First Circuit held that a mortgagee-insured has only a security interest in the insured property and actual loss cannot be determined until the "insurer or the insured sues on the note and the debtor fails to pay." 920 F.2d at 1063. Focus did not bring an action against the debtor, Marderosian, to collect the outstanding debt. The jury was instructed that

> [i]n order to recover under the policy, plaintiff must show by a preponderance of the evidence not only that the amount owing on the loan is unpaid but also the fact that this amount is uncollectible. A loan is uncollectible if a reasonable lender, in the same circumstances as plaintiff, but with no recourse except against the borrower, would choose to write-off the loan as uncollectible. In other words, plaintiff must show by a preponderance of the evidence that the costs of attempting to collect the loan are likely to be greater than any amount that is likely to be recovered from the borrower. Unless you find that plaintiff's loan is uncollectible, you should proceed no further and you should enter your verdict for defendants.

Jury Instructions, p. 32.

There was sufficient evidence to support the jury's finding that the loan was uncollectible. At trial, Edward Sarbey, President of Focus Investment Associates, testified of his unsuccessful attempts to collect the debt from the borrower and of his investigation into the borrower's assets. Mr. Sarbey also testified that, based upon his investigation, advice received from Commercial Bank, one of Marderosian's creditors, and upon advice of counsel, he concluded that the cost of attempting to collect the debt from Marderosian was likely to exceed any amount likely to be recovered. Defendants made no attempt to contradict or refute this evidence.

Focus also offered the testimony of Marderosian, but he asserted his Fifth Amendment privilege against self-incrimination. He refused to testify concerning his assets and whether he or the trust had any ability to pay the loan. Since this was a civil trial, the jury was entitled to draw any reasonable inference from Marderosian's testimony. *See Baxter v. Palmigiano*, 425 U.S. 308, 316, 96 S.Ct. 1551, 1557, 47 L.Ed.2d 810 (1976). Any such inference, combined with Mr. Sarbey's testimony, presented more than sufficient evidence from which the jury could have concluded that the loan was uncollectible, thus, excusing compliance with the requirements of *Falmouth*.

The *Falmouth* decision was not intended to require an insured to expend time, effort and money in futile gestures to collect against an insolvent debtor as a prerequisite to establishing damages against the insurer. A plaintiff is not required to undertake futile efforts "when it is 'crystal clear and certain' that he could not have a favorable outcome." *Power v. Providence*, 582 A.2d 895, 899 (R.I.1990) (citing *Ambeault v. Burrillville Racing Ass'n*, 118 R.I. 310, 315, 373 A.2d 807, 809 (1977)).

The jury could have reasonably found that American was in breach of the insurance contract. Therefore, American's motion for judgment n.o.v. on this claim is denied.

## VI. CONCLUSION

The defendant's motion for judgment n.o.v. is granted with respect to the negligence claims but denied on the claim for breach of contract.