**COMMONWEALTH LLOYD'S
INSURANCE COMPANY,
Appellant,**

v.

**Roy E. THOMAS and Margie
Thomas, Appellees.**

No. 05–90–00785–CV.

Court of Appeals of Texas,
Dallas.

Jan. 15, 1992.

Rehearing Denied Feb. 13, 1992.

Robert D. Allen, David J. Schubert, and Thomas B. Alleman (on appeal only), Dallas, for appellant.

Timothy M. Fults and James N. Francis, Dallas, for appellee.

Before STEWART, THOMAS and MALONEY, JJ.

## OPINION ON MOTION FOR REHEARING

MALONEY, Justice.

We overrule appellant's motion for rehearing. We grant appellees' motion for rehearing. We withdraw our opinion of September 13, 1991. The following is now the opinion of this Court.

Commonwealth Lloyd's Insurance Company appeals from a judgment rendered for Roy E. Thomas and Margie Thomas. The Thomases sued Commonwealth, alleging breach of the duty of good faith and fair dealing. Commonwealth asserts eight points of error. We sustain the sixth point of error complaining of the trial court's award of prejudgment interest. In all other respects, we affirm the trial court's judgment.

### STATEMENT OF FACTS

In the early morning of February 2, 1981, fire destroyed the Thomases' house. The Thomases were out of the country when the fire occurred. Commonwealth was the insurer of the Thomases' home and its contents. Commonwealth hired Loss Research and Analysis, Inc. (LRA) to investigate the fire. LRA's report concluded that arson was the cause of the fire.

On May 4, 1981, Commonwealth rejected the Thomases' proofs of loss submitted for unscheduled property because of specified deficiencies. Commonwealth also informed the Thomases that it was "continuing to investigate other apparent policy violations concerning the true origin of the fire." The Thomases sued Commonwealth on the policy in Tarrant County. Commonwealth defended on grounds of arson and the Thomases' failure to substantially comply with the policy requirements. The Tarrant County jury found for the Thomases. The trial court rendered judgment for the Thomases on July 11, 1983. The appeals court affirmed the trial court's judgment. *See Commonwealth Lloyd's Ins. Co. v. Thomas*, 678 S.W.2d 278 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.).

The Thomases sued Commonwealth for breach of the duty of good faith shortly after the Supreme Court of Texas rendered its decision in *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165 (Tex.1987). A Dallas County jury found for the Thomases. The trial court rendered judgment for the Thomases. The judgment did not apportion the sum of money awarded to the Thomases. However, it is apparent from the record and the briefs that $708,800 is for actual damages, $2,000,001 for exemplary damages, and $1,000,637.60 for prejudgment interest.

After the trial court rendered judgment for the Thomases, Commonwealth timely filed a motion for judgment n.o.v. and a motion for new trial. More than thirty days after the judgment was signed, the Supreme Court of Texas issued its opinion in *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826 (Tex.1990). Commonwealth then filed an amended motion for judgment n.o.v. This amended motion asserted that the Thomases' claim was barred by the statute of limitations under *Murray*. The trial court denied all of Commonwealth's postjudgment motions.

### THE EXPERT TESTIMONY

#### 1. The Thomases' Experts

Expert witnesses testified for both Commonwealth and the Thomases. Gary Fye, the primary witness for the Thomases, was a fire and accident investigator. His background was in arson investigations. Fire insurance was his specialty. He testified from a review of the Tarrant County trial record, depositions, a copy of Commonwealth's claim file, and Commonwealth's claim manual.

Fye testified that Commonwealth suspected arson from the beginning. Commonwealth's entire investigation was outcome oriented—to make arson "stick in court." The day after the fire, the Tarrant County Fire Marshal told Melvin Babb,

Commonwealth's adjustor, that the fire was caused by an electrical short. Babb ignored the conversation. Commonwealth's investigators did not follow up on any of the information provided by eyewitnesses to the fire. If Commonwealth found any evidence subject to two interpretations, it took the position adverse to the Thomases and made no other inquiries. The Thomases had recently increased the insurance coverage on their home. If the adjustors had inquired, they would have found that the increase was done at their insurance agent's suggestion. They were underinsured, according to their agent. Also, the adjustors would have found that questionable aspects of a previous burglary claim were the result of an insurance adjustor incorrectly adding a column of figures.

John Henning, a fire investigator for State Farm Insurance, testified. He mistakenly investigated the Thomas fire. State Farm hired him to investigate a suspected arson fire in the general area of the Thomases' house. He went to the wrong fire. His investigation indicated an electrical fire that started in the utility room. It then traveled through the attic and burned down into the other areas. His conversations with eyewitnesses confirmed his findings.

The Tarrant County Fire Marshal's official conclusion was that the fire was of undetermined origin. However, Bobby Dyer, a Tarrant County deputy fire marshal, testified that he believed the fire was caused by a massive short in an area around the electrical panel box. According to Dyer, the fire spread from the electrical short to the attic, over the roof, and down into the living room.

Britt McManus, an investigator for LRA, called Dyer the day after the fire. McManus said he needed to begin his investigation immediately. Dyer told McManus that he had not finished his investigation. They arranged to meet the next day at the fire scene. When Dyer arrived at the fire scene, LRA was using a front-end loader to clear debris from the bedrooms. They already had removed debris from the garage. Dyer was unable to complete his investiga-tion because the fire scene had been disturbed and evidence destroyed.

LRA asked Dyer to test some evidence, to file arson charges against the Thomases, and to ask the Thomases to take a lie detector test. He never tested the evidence or filed charges. Dyer stated that he would not use evidence that he could not prove was taken from the fire scene. He disregarded evidence of diesel fuel and petroleum distillate because his office had not collected the evidence.

Duane Selman, a fire investigator, testified in the Tarrant County trial. He testified in this trial through the Tarrant County statement of facts. Selman examined the slab at the fire. He also examined all photographs of the fire scene, all depositions that were related to the fire, and reports of the Tarrant County Fire Marshal. He talked with everyone that was present during the fire. He was convinced the fire originated in the wall behind the electrical panel box. When asked: "[W]as the diesel fuel in the bathtub there before the fire, during the fire, or after the fire," he answered: "It was after the fire."

### 2. Commonwealth's Experts

Melvin Babb, an adjustor for Commonwealth, contacted the Thomases' insurance agent to verify coverage. He learned that the Thomases had increased their homeowner's coverage the previous November. Three days after the fire, Kenneth Gibson of LRA told him that the fire was caused by arson. He also learned there were several suits pending against Roy Thomas, one of which involved a default on a debt. The adjustor that handled the previous theft loss for the Thomases called Babb and told him the earlier loss was questionable. Babb talked to a neighbor who said his wife smelled paint or paint thinner at the time of the fire. He found no evidence that the Thomases had anything to do with the fire.

Andrew Armstrong, a chemist, testified he examined the eight debris samples that LRA brought from the fire. Three of the eight samples tested positive for petroleum distillate. Armstrong understood that the

three positive samples were from the Thomases' bathtub and living room area. He identified the material "found in the bathtub" as diesel fuel. He testified the "living room sample" was severely stressed or greatly evaporated. Armstrong identified the "living room sample" as being consistent with diesel. On cross-examination, he admitted it was also consistent with gun solvent, charcoal lighter fluid, kerosene, or paint thinner. He stated it was possible, but not likely, that the "living room sample" could be affected by fire fighting methods.

H. Dustin Fillmore, a Fort Worth attorney with experience in insurance matters, reviewed materials regarding the Thomases' claim. He testified that the Thomases expressed a desire to tear down the structure when they were aware that an investigation was in progress. There was evidence that the Thomases were in financial distress. They had substantially increased their coverage the previous November. The house's security system was not armed at the time of the fire.[1]

Robert M. Booker, the regional property supervisor for Commonwealth, testified that he visited the scene of the fire. He saw several areas of extensive burning, with areas of less extensive damage between the areas of extensive burning. He indicated that the LRA report, evidence of the Thomases' financial distress or his lack of access to financial records, the Thomases' refusal to take the deputy fire marshal's polygraph test, and the burglar alarm system being disarmed convinced him that the Thomases' claim should not be honored. Commonwealth never proved that the fire was arson.

Britt McManus of LRA testified he found indications the fire was intentionally set. He found evidence the fire originated in two distinct areas. He found no evidence of horizontal or interior involvement between the two areas. Samples were found that were determined to be diesel fuel. He saw evidence of electrical shorting in the garage, but no evidence that the fire originated there. He acknowledged that eye-

witnesses said the fire was a localized fire that spread into the attic. The first person on the scene was a Burleson police officer, who stated the fire was coming out of the roof over the garage. McManus disagreed with the police officer's account of the early fire. In his opinion, the police officer probably missed what was happening inside the structure.

Kenneth Gibson of LRA testified that he found diesel fuel in two widely separated areas of the house at floor level. He believed the fire was a classic accelerated type fire.

## STATUTE OF LIMITATIONS

In its first point of error, Commonwealth contends that the trial court erred in rendering judgment for the Thomases because the applicable statute of limitations barred their cause of action. It is undisputed that Commonwealth denied the Thomases' claim in 1981 and the Thomases filed this suit in March 1987.

The *Arnold* court held that the two-year limitations period on a claim alleging an insurer's breach of the duty of good faith and fair dealing accrues when the underlying insurance contract claims are finally resolved. *Arnold*, 725 S.W.2d at 168. On April 18, 1990, the *Murray* court held that a claim accrues when the insurer wrongfully denies coverage. *Murray*, 800 S.W.2d at 828–29.

### a. Postjudgment Motions

Commonwealth complains that the trial court erred in not granting its amended motion for judgment n.o.v. Commonwealth contends that an amended motion for judgment n.o.v. is timely if filed before a pending motion for new trial is overruled.

Commonwealth cites *Spiller v. Lyons*, 737 S.W.2d 29 (Tex.App.—Houston [14th Dist.] 1987, no writ), as authority for this contention. We find *Spiller* unpersuasive. The *Spiller* court relied on *Commercial Standard Insurance Co. v. Southern Farm Bureau Casualty Insurance Co.*, 509 S.W.2d 387, 392 (Tex.Civ.App.—Corpus

---

1. Margie Thomas testified that she had armed the system when they left town.

Christi 1974, writ ref'd n.r.e.), as the only authority for its holding. *Commercial Standard,* decided in 1974, applied an earlier version of the rule. Rule 329b was substantially amended effective January 1, 1981. *See* Barrow, *Appellate Procedure Reform,* 12 ST. MARY'S L.J. 615, 619 & n. 18 (1981); Guittard, *Other Significant Changes in the Appellate Rules,* 12 ST. MARY'S L.J. 667, 669 & n. 8 (1981); Pope & McConnico, *Practicing Law With the 1981 Texas Rules,* 32 BAYLOR L.REV. 457, 499 (1980).

The applicable procedural rule states:

The following rules shall be applicable to motions for new trial and motions to modify, correct, or reform judgments (other than motions to correct the record under Rule 316) in all district and county courts:

(a) A motion for new trial, if filed, shall be filed prior to or within thirty days after the judgment or other order complained of is signed.

(b) One or more amended motions for new trial may be filed without leave of court before any preceding motion for new trial filed by the movant is overruled *and within thirty days after the judgment or other order complained of is signed.*

. . . .

(g) A motion to modify, correct, or reform a judgment (as distinguished from motion to correct the record of a judgment under Rule 316), if filed, shall be filed and determined within the time prescribed by this rule for a motion for new trial. . . .

TEX.R.CIV.P. 329b(a), (b), & (g) (emphasis added).

Subdivision (g) of the rule applies the same filing deadline to motions to modify, correct, or reform a judgment that it applies to motions for new trial. This Court, in *Brazos Electric Power Cooperative, Inc. v. Callejo,* 734 S.W.2d 126, 128 (Tex. App.—Dallas 1987, no writ), determined that any postjudgment motion that, if granted, would result in a substantive change in the judgment, was governed by subdivision (g). A postjudgment motion

for judgment n.o.v., amended or not, would result in a substantive change in the trial court's judgment.

### b. Conclusion

■ Texas courts have held that an amended motion for new trial filed more than thirty days after the signing of the judgment is untimely and a nullity. *Voth v. Felderhoff,* 768 S.W.2d 403, 412 (Tex. App.—Fort Worth 1989, writ denied); *Equinox Enter., Inc. v. Associated Media Inc.,* 730 S.W.2d 872, 875 (Tex.App.—Dallas 1987, no writ). Although subdivision (g) does not specifically refer to *amended* motions, the courts apply the same deadline to amended motions for new trial that the rule applies to original motions for new trial. We find no language in the rule that suggests that amended motions to modify, correct, or reform a judgment should be treated differently from original motions. We hold that an amended motion to modify, correct, or reform the judgment must be filed within thirty days after the judgment is signed. Because Commonwealth did not file its amended motion for judgment n.o.v. within thirty days after the judgment was signed, the amended motion was untimely and a nullity.

To preserve a complaint for appellate review, a party must have presented to the trial court a *timely* request, objection, or motion stating the ground for the ruling desired by the party. TEX.R.APP.P. 52(a). Commonwealth did not preserve the error that it now asserts on appeal. We overrule the first point of error.

### RETROACTIVE APPLICATION

In the seventh point of error, Commonwealth argues that the trial court erred in rendering judgment for the Thomases "based on the Jury's answer to question No. 1 because it constitutes an illegal retroactive application of a cause of action. . . ." The Supreme Court of Texas first recognized a cause of action for breach of an insurer's duty of good faith and fair dealing in 1987. *Arnold,* 725 S.W.2d at 167. The denial of the Thomases' claim under the policy occurred in 1981.

The Thomases argue that *Marino v. State Farm Fire & Casualty Insurance Co.*, 787 S.W.2d 948 (Tex.1990), dispels any doubt regarding the question of retroactivity. We do not agree. The only issue addressed in *Marino* was whether the doctrine of res judicata barred the insured's claim of breach of the duty of good faith. *Id.* at 949. Res judicata is separate and distinct from the issue of retroactive application of *Arnold*. Nothing in the *Marino* opinion indicates that the insurer even argued against retroactive application of *Arnold*. *Marino* does not help the Thomases.

■ Generally, a decision of the Supreme Court of Texas applies retroactively, but considerations of fairness and policy may preclude retroactive application. *Service Lloyd's Ins. Co. v. Greenhalgh*, 771 S.W.2d 688, 691 (Tex.App.—Austin 1989), *rev'd on other grounds*, 787 S.W.2d 938 (Tex.1990). "Resolution of the issue turns primarily on the extent of public reliance on the former rule and the ability to foresee a coming change in the law." *Sanchez v. Schindler*, 651 S.W.2d 249, 254 (Tex. 1983).

■ Reliance on a former rule is not in issue. The Supreme Court of Texas, before *Arnold*, never addressed whether an insurance company owed a duty of good faith and fair dealing to its insured.

*Greenhalgh*, 771 S.W.2d at 692. Those insurers who dealt with their insureds in good faith never needed to rely upon the absence of a cause of action for bad faith.

Further, we believe that the *Arnold* decision was foreseeable. A substantial number of other jurisdictions had recognized the cause of action well before *Arnold* was decided.[2] Insurers surely were aware of developments in other jurisdictions.

Texas courts also consider if a newly announced rule can be implemented without retroactive application and if there is a likelihood that retroactive application may substantially burden the administration of justice. *Ex parte Hovermale*, 636 S.W.2d 828, 836 (Tex.App.—San Antonio 1982, no writ). Virtually all newly recognized causes of action could be given effect without retroactive application. However, retroactive application of *Arnold* would not significantly add to the burdens borne by our courts. The *Murray* court's recent modification of the limitation rule in an *Arnold* cause of action has greatly reduced any effect retroactive application might have on the administration of justice.

Texas recognizes exceptions to the general rule of retroactive application.[3] Nevertheless, the factors weigh in favor of retroactive application of *Arnold*.[4] Because, like the *Greenhalgh* court, we can

**2.** *See Chavers v. National Sec. Fire & Casualty Co.*, 405 So.2d 1 (Ala.1981); *United Services Auto. Ass'n v. Werley*, 526 P.2d 28 (Alaska 1974); *Noble v. National Am. Life Ins. Co.*, 128 Ariz. 188, 624 P.2d 866 (1981); *Aetna Casualty & Sur. Co. v. Broadway Arms Corp.*, 281 Ark. 128, 664 S.W.2d 463 (1984); *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 510 P.2d 1032, 108 Cal.Rptr. 480 (1973); *Rederscheid v. Comprecare, Inc.*, 667 P.2d 766 (Colo.Ct.App.1983); *Grand Sheet Metal Prods. Co. v. Protection Mut. Ins. Co.*, 34 Conn. Supp. 46, 375 A.2d 428 (1977); *Feathers v. State Farm Fire & Casualty Co.*, 667 S.W.2d 693 (Ky. Ct.App.1983); *Lipinski v. Title Ins. Co.*, 202 Mont. 1, 655 P.2d 970 (1982); *United States Fidelity & Guar. Co. v. Peterson*, 91 Nev. 617, 540 P.2d 1070 (1975); *State Farm Gen. Ins. Co. v. Clifton*, 86 N.M. 757, 527 P.2d 798 (1974); *Payne v. North Carolina Farm Bureau Mut. Ins. Co.*, 67 N.C.App. 692, 313 S.E.2d 912 (1984); *Corwin Chrysler–Plymouth, Inc. v. Westchester Fire Ins. Co.*, 279 N.W.2d 638 (N.D.1979); *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 452 N.E.2d 1315 (1983); *Christian v. American Home Assurance Co.*, 577 P.2d 899 (Okla.1978); *Bibeault v.*

*Hanover Ins. Co.*, 417 A.2d 313 (R.I.1980); *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368 (1978).

**3.** *See Friedman v. Texaco, Inc.*, 691 S.W.2d 586, 587, 589 (Tex.1985); *First Int'l Bank v. Roper Corp.*, 686 S.W.2d 602, 603 (Tex.1985); *Whittlesey v. Miller*, 572 S.W.2d 665, 669 (Tex.1978); *Felderhoff v. Felderhoff*, 473 S.W.2d 928, 933 (Tex.1971); *Chase Commercial Corp. v. Datapoint Corp.*, 774 S.W.2d 359, 362 (Tex.App.— Dallas 1989, no writ).

**4.** The Supreme Court of Texas has extended the duty of good faith and fair dealing to workers' compensation insurance carriers. *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 212–13 (Tex.1988). The Austin Court of Appeals has held that *Aranda* should be retroactively applied to a case that was pending on appeal when *Aranda* was decided. *Service Lloyds Ins. Co. v. Greenhalgh*, 771 S.W.2d 688, 691–92 (Tex.App.— Austin 1989), *rev'd on other grounds*, 787 S.W.2d 938 (Tex.1990).

conceive of no policy consideration that "favors shielding a party from liability for bad faith," we apply *Arnold* retroactively. *Greenhalgh*, 771 S.W.2d at 692. We overrule the seventh point of error.

## SUFFICIENCY OF THE EVIDENCE

In its second point of error, Commonwealth contends that the trial court erred in rendering judgment for the Thomases because the evidence was either legally or factually insufficient to support a finding of breach of the duty of good faith and fair dealing. In its third point of error, Commonwealth contends that the evidence was either factually or legally insufficient to support the jury findings of actual damages. Commonwealth maintains the evidence is insufficient to support the jury's awards of damages for mental anguish, loss of credit, and expert witness fees. In its fourth point of error, Commonwealth contends that the trial court erred in rendering judgment for punitive damages. It asserts that the evidence was either legally or factually insufficient to support the jury's finding that Commonwealth acted with conscious indifference to the rights or welfare of the Thomases. Commonwealth argues in its fifth point of error that the trial court erred in rendering judgment for punitive damages because the amount awarded was grossly excessive as a matter of law or against the great weight and preponderance of the evidence. The jury assessed exemplary damages in the amount of $2,000,001.

### 1. Standard of Review

#### a. Legal Insufficiency or No Evidence

■ A "legally insufficient evidence" point is a "no evidence" point presenting a question of law. We consider only the evidence and inferences that tend to support the jury's findings and disregard all evidence and inferences to the contrary. *Jacobs v. Danny Darby Real Estate, Inc.*, 750 S.W.2d 174, 175 (Tex.1988). A no evidence point is sustained only when the record discloses one or more of the following:

1) a complete absence of evidence of a vital fact,
2) the only evidence offered to prove a vital fact is barred from consideration by rules of law or evidence,
3) the evidence offered to prove a vital fact is no more than a mere scintilla, or
4) the evidence conclusively establishes the opposite of a vital fact.

*C & C Partners v. Sun Exploration & Prod. Co.*, 783 S.W.2d 707, 716 (Tex.App.—Dallas 1989, writ denied).

#### b. Factual Insufficiency

■ We consider and weigh all of the evidence, including any evidence contrary to the trial court's judgment. *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). We cannot set aside a jury finding unless it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

■ This Court is not a fact finder, and we cannot substitute our judgment for that of the jury even if a different answer could be reached on the evidence. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). The jury weighs the evidence, assesses the credibility of the witnesses, and resolves conflicts and inconsistencies. *Loyd Elec. Co. v. Millett*, 767 S.W.2d 476, 482 (Tex. App.—San Antonio 1989, no writ). The jurors are the judges of the facts proved *and* of the reasonable inferences to be drawn therefrom. *Lockley v. Page*, 142 Tex. 594, 598, 180 S.W.2d 616, 618 (1944).

### 2. Application of Law to Facts—Good Faith and Fair Dealing

#### a. No Evidence

Commonwealth argues that it had two reasonable bases for denying the Thomases' claim: (1) Commonwealth's suspicion of arson and (2) the insufficiency of the proofs of loss submitted by the Thomases. Commonwealth contends that no evidence exists of a breach of the duty of good faith or the absence of such a breach was established conclusively (as a matter of law).

Commonwealth cites a number of cases from other jurisdictions. These cases effectively hold that if there is an issue of fact or conflicting evidence on whether the insurer had a basis for denying its insured's claim, an insurer is not liable for a breach of the duty of good faith. Those holdings are inconsistent with Texas law. Commonwealth may disagree with the test established by the Supreme Court of Texas, but we apply Texas law, not the law of other jurisdictions.[5]

The Supreme Court of Texas has clearly stated the elements of a claim alleging breach of the insurer's duty. Whether there has been such a breach is an issue of fact. The trier of fact determines whether there was no *reasonable* basis for denying the claim and whether the insurer knew or should have known that there was no reasonable basis for denying the claim. *See Arnold,* 725 S.W.2d at 167.

The trial court instructed the jury on the *Arnold* standard. By its answer to question number one, the jury found that Commonwealth had breached the duty of good faith and fair dealing by denying or delaying payment of the Thomases' claim.

### 1) Breach of Good Faith

Fye testified that Commonwealth's investigation failed to identify the primary point of the fire's origin. Without knowing the point of origin, no investigator could have a reasonable basis for a determination of arson. Commonwealth's investigation did not meet its own standards of objectivity—it engaged in a pattern of pursuing only those investigative leads that were adverse to the Thomases. The jury heard evidence that Commonwealth's suspicion of arson was unfounded and unreasonable.

Fye's testimony provided support for the jury's finding that Commonwealth breached the duty of good faith and fair dealing. His testimony included evidence that there was no *reasonable* basis for denial of the Thomases' claim. It also provided support

for a determination that Commonwealth either knew or should have known that there was no basis for denial.

### 2) Proofs of Loss

Commonwealth contends that the defective proofs of loss provided a basis for denying the claim. The disputed proofs of loss applied only to the contents of the house. There was no question that the house itself had been destroyed. The policy provided coverage of $270,000 for the dwelling alone. Yet Commonwealth made no payment to the Thomases other than an advance payment of $10,000. That payment certainly did not constitute payment of the policy benefits due for destruction of the house. Even if the proofs of loss were defective, Commonwealth had no basis for denial of the *entire* claim.

Moreover, Fye testified that Commonwealth's handling of the proofs of loss was unreasonable. Roy Thomas testified he dealt mainly with Melvin Babb, Commonwealth's adjustor. Babb told the Thomases they needed to make a list of the contents of the house. Babb never told the Thomases that Commonwealth paid claims only when proofs of loss were timely submitted. The Thomases learned of the necessity of submitting proofs of loss from their own attorney. We hold that the above testimony was some evidence that Commonwealth breached its duty of good faith and fair dealing.

### b. Factual Insufficiency

The evidence conflicted on many factual issues. The jury heard considerable evidence confirming that no reasonable basis for denying the Thomases' claim existed and that Commonwealth either knew or should have known that no basis for denial existed. However, other witnesses testified that Commonwealth had a reasonable basis for denying the claim.

Several witnesses testified that there was no reasonable basis for determining

---

5. Commonwealth also relies upon *National Union Fire Insurance Co. v. Hudson Energy Co.,* 780 S.W.2d 417 (Tex.App.—Texarkana 1989), *aff'd,* 811 S.W.2d 552 (Tex.1991). To the extent, if any, that this case departs from applicable Texas law, we decline to follow it. *See* 780 S.W.2d at 425–27.

that the fire was caused by arson. Testimony supported a reasonable inference that the LRA investigation was of questionable integrity. The evidence was moved by a front-end loader before the fire marshal had the opportunity to examine it. Because the fire marshal could not establish where the debris was found, he would not analyze the debris. Selman testified that he believed the diesel fuel appeared in the tub after the fire.

Numerous expert witnesses, including the "accidental investigator" and the fire marshal, disagreed with the LRA findings. Fye suggested that those findings were predestined by Commonwealth. Even if the jury had accepted the evidence indicating arson, no testimony ever connected the Thomases to arson. The policy covered arson loss in the absence of fraud. Commonwealth never had any evidence connecting the insureds to the "arson."

Commonwealth did not follow its own policy mandating an objective investigation. Commonwealth followed a pattern of pursuing investigative leads that were adverse to the Thomases' interests. It did not pursue leads that might have proved favorable to the Thomases. Commonwealth did not seek information from the Thomases, or their attorney, when such information might have dispelled its suspicions.

Commonwealth either misled the Thomases or failed to disclose information about its investigation and resulting suspicions. Even after the Thomases' attorney asked Commonwealth why it sought certain information and suggested that Commonwealth was engaging in unfair and deceptive practices, Commonwealth did not divulge its suspicions.

The jury's finding that Commonwealth breached its duty of good faith and fair dealing is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. The evidence supportive of the jury's finding is strong and substantial. Cases relied upon by Commonwealth involved facts and circumstances that differed in important respects from the facts and circumstances of this case.[6] We overrule the second point of error.

### 3. Application of Law to Facts–Damages

#### a. Actual Damages

##### 1) Mental Anguish

Mental anguish includes the emotional response of the plaintiff to a tortfeasor's conduct. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 368 (Tex.1987). It requires more than mere worry, anxiety, vexation, embarrassment, or anger to recover damages for mental anguish. The plaintiff must establish a relatively high degree of mental pain and distress resulting from such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, and public humiliation. *Town East Ford Sales, Inc. v. Gray*, 730 S.W.2d 796, 803 (Tex. App.—Dallas 1987, no writ) (op. on mot. for reh'g); *see Underwriters Life Ins. Co. v. Cobb*, 746 S.W.2d 810, 819 (Tex.App.—Corpus Christi 1988, no writ). Emotional distress can be inferred from the unrepaired condition of the insureds' home and their shortage of clothes and furniture. *Automobile Ins. Co. v. Davila*, 805 S.W.2d 897, 907 (Tex.App.—Corpus Christi 1991, writ denied). Because there are no objective guidelines by which the money equivalent of mental pain may be measured, the jury must be allowed considerable discretion in fixing the amount. *National Union Fire Ins. Co. v. Dominguez*, 793 S.W.2d 66, 73 (Tex.App.—El Paso 1990, writ denied); *Green v. Meadows*, 527 S.W.2d 496, 499 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.).

6. *See St. Paul Lloyd's Ins. Co. v. Huang*, 808 S.W.2d 524, 526 (Tex.App.—Houston [14th Dist.] 1991, writ denied) (op. on mot. for reh'g) (both parties stipulated that fire was caused by arson; plaintiff failed to produce evidence controverting insurer's evidence); *St. Paul Guardian Ins. Co. v. Luker*, 801 S.W.2d 614, 620–21 (Tex. App.—Texarkana 1990, no writ) (all experts reached conclusion of arson and no evidence to contrary; evidence of inculpatory statements made by one of the plaintiffs; witness reported seeing person resembling one of the plaintiffs on the premises prior to the fire).

### a) Legal Insufficiency or No Evidence

Margie Thomas was a real estate broker. Roy Thomas was a builder. Most of their business transactions involved title companies, mortgage companies, savings and loans, and banks. The newspaper covered the fire. When they did not rebuild their home, people began asking questions. Margie Thomas testified that people knew that they had not collected on their insurance claim because of arson accusations. Commonwealth's accusations caused them to lose credibility with their associates. They lost business. Their ability to borrow money was adversely affected. Suppliers wanted to wait until the insurance matter was settled before extending credit to them.

The accusations of arson also affected their personal life. They suffered embarrassment in front of their friends. After the fire, the Thomases' living conditions deteriorated considerably. They moved to a hotel apartment, from there they moved in with their daughter, then they moved into a house and rented furniture, and, because of the expense, ultimately moved into a travel trailer. The situation caused grief at home.

Margie Thomas testified that the arson allegations affected her husband mentally. He had been known in the community for a long time. The situation caused him business and personal problems.

We consider the above testimony, together with the testimony of Commonwealth's direct contact with the Thomases. We find that this evidence supports the jury's award of damages for mental anguish.

### b) Factual Insufficiency

We examine all of the evidence to determine if the Thomases' testimony was impeached. It was not. It was not even controverted.

Commonwealth claims that the above testimony did not "go beyond mere disappointment, anger, resentment or embarrassment." It cites Roy Thomas's testimony that none of their friends believed they were arsonists. Commonwealth asserts that the only testimony that Margie Thomas was disturbed arose from her change of residences and that Commonwealth was not responsible for their moves.

Commonwealth also asserts that the Thomases' embarrassment occurred because of the arson allegations. It maintains that, since these allegations were made in the course of legal proceedings, they are absolutely privileged and cannot support a claim for mental anguish. Commonwealth relies on *James v. Brown*, 637 S.W.2d 914, 916–17 (Tex.1982), and *Davis v. Davis*, 734 S.W.2d 707, 711–12 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.), as authority for this theory. Commonwealth's reliance is misplaced. *James* was a suit for defamation. Mrs. James sued mental health workers for defamation because of a diagnosis made in connection with an involuntary commitment. The *James* court, in interpreting the immunity provisions under the mental health code, stated "persons acting in bad faith, unreasonably, and negligently ... are not free from liability." *James*, 637 S.W.2d at 918. *Davis* holds that communications in a judicial proceeding are not a basis for a civil action for libel or slander. *Davis*, 734 S.W.2d at 711. The Thomases did not sue for libel or slander.

We find the jury's award of $200,000 for the mental anguish of Roy Thomas and $300,000 for the mental anguish of Margie Thomas is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust.

### 2. Loss of Credit

The amount of damages for loss of credit must only be established with the degree of certainty to which it is susceptible. *Davila*, 805 S.W.2d at 908. Damages must be established with reasonable certainty. If it is impossible to establish the exact amount of damages, failure to do so is not a basis for denying recovery. *Green Tree Acceptance, Inc. v. Combs*, 745 S.W.2d 87, 92 (Tex.App.—San Antonio 1988, writ denied).

a) Legal Insufficiency or No Evidence

The Thomases testified that they depended upon borrowed money to operate their businesses. They had houses in various stages of completion at the time of the fire. Although Roy Thomas stated that one of his companies was denied credit before the fire occurred, he also indicated that an existing $6,000,000 line of credit was reduced to zero because of Commonwealth's conduct. The Thomases were unable to borrow money until the insurance dispute was settled.

The insurance dispute was finally resolved when the Supreme Court of Texas refused Commonwealth's application for writ of error in the Tarrant County lawsuit. The appeals court affirmed the trial court's judgment in October 1984. Sterling Steves, the Thomases' attorney, testified that the supreme court acted nine months to a year later. The adverse effects of loss of credit lasted for several years. This testimony supported the jury's finding of loss of credit.

b) Factual Insufficiency

When we examine all of the testimony, we find that Roy Thomas testified he had large debts. Thomas owed delinquent interest on those debts before the fire. However, the Thomases testified there was sufficient property to cover their debts. The Thomases had income in excess of $150,000 the calendar year before the fire. Robert Salata, a certified public accountant, testified that the Thomases were having significant financial problems before the fire. However, he also admitted that using a different, but acceptable, method of accounting would produce conclusions more favorable to the Thomases.

The jury had a broad range within which to assess damages. Based on the circumstances as shown by the evidence, we hold that the jury's award was not unwarranted. We find the evidence supports the jury's award of $100,000 for loss of credit. We also find the jury's award was not so contrary to the overwhelming weight of the evidence that it was wrong and unjust.

3. Expert Witness Fees

Commonwealth's final complaint about actual damages concerns the jury's award of $29,000 for expert witness expenses incurred by the Thomases in the Tarrant County litigation. Commonwealth's point of error recites that the evidence is insufficient to support the award of expert witness expenses. However, Commonwealth only asserts in its brief that there was no legal justification for recovery of these damages.

To preserve a complaint for appellate review, a party must present its complaint to the trial court and must state the *specific* grounds for the ruling it desires if the specific grounds are not apparent from the context. TEX.R.APP.P. 52(a). The complaint raised on appeal must be the same as the complaint presented to the trial court. *See Hooten v. Dunbar,* 347 S.W.2d 775, 777–78 (Tex.Civ.App.—Beaumont 1961, writ ref'd n.r.e.). A party may not enlarge a ground of error on appeal to include an objection not asserted at trial. *Pfeffer v. Southern Texas Laborers' Pension Trust Fund,* 679 S.W.2d 691, 693 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The orderly administration of justice requires that objections be raised in the trial court in order that justice may be done there. *Powell v. Powell,* 604 S.W.2d 491, 493 (Tex.Civ.App.—Dallas 1980, no writ).

The trial court submitted a jury question on damages for expert witness expenses incurred in the Tarrant County litigation. Commonwealth did not object to the submission of this issue. Commonwealth asserted in its postjudgment motions that the evidence was legally and factually insufficient to support the jury's award of such damages. No postjudgment motion complained that the damages were not recoverable. Commonwealth's trial complaint differs from the complaint it now asserts on appeal.

The trial court had no opportunity to grant Commonwealth relief on the ground it asserts on appeal. Because Commonwealth's complaint on appeal is different

from the complaint made to the trial court, any error in awarding damages for expert witness expenses was waived. We overrule the third point of error.

### b. Exemplary Damages

■▬▬ Assessment of exemplary damages promotes the protection of an important public interest by making an example of a defendant for wrongful and malicious conduct. *K–Mart Corp. v. Trotti*, 677 S.W.2d 632, 640 (Tex.App.—Houston [1st Dist.] 1984), *writ ref'd n.r.e. per curiam*, 686 S.W.2d 593 (Tex.1985). Although the amount of exemplary damages should be reasonably proportioned to the actual damages found, the amount to be awarded is generally within the jury's discretion. *Southwestern Inv. Co. v. Neeley*, 452 S.W.2d 705, 707–08 (Tex.1970). We must determine whether the award was excessive based on the facts of the particular case. We consider the following factors:

1) the degree of outrage produced by the wrong (or the extent to which the wrongdoer's conduct offends a public sense of justice and propriety),

2) the nature of the wrong,

3) the character of the conduct involved,

4) the degree of the wrongdoer's culpability,

5) the situation and sensibilities of the parties,

6) the frequency of the wrongful conduct, and

7) the size of an award needed to deter similar wrongs in the future.

*Wright v. Gifford–Hill & Co.*, 725 S.W.2d 712, 714 (Tex.1987); *Trotti*, 677 S.W.2d at 640; *Neeley*, 452 S.W.2d at 707.

### 1. Conscious Indifference

#### a) Legal Insufficiency or No Evidence

■▬▬ After detailing Commonwealth's conduct, Fye, the Thomases' primary expert witness, stated his opinion that the conduct was engaged in with a conscious indifference to the Thomases' rights. He characterized Commonwealth's handling of the Thomases' claim as outrageous—one of the worst he had seen. This was some evidence to support the jury's finding.

#### b) Factual Insufficiency

The evidence was consistent with a finding that Commonwealth acted with conscious indifference to the Thomases' rights and interests. The evidence suggested that Commonwealth's defense of arson fraud was based on flimsy or nonexistent evidence. The investigation conducted by Commonwealth was less than objective. It pursued only those investigative leads that were unfavorable to the Thomases. It did not pursue leads that were inconsistent with the theory of arson fraud. Commonwealth did not disclose its suspicions to the Thomases, thereby depriving the Thomases of the opportunity to explain the "suspicious" circumstances relied upon by Commonwealth.

There was also evidence that would have supported a finding that Commonwealth did *not* act with conscious indifference to the rights of the Thomases. However, the jury's finding of conscious indifference was not so against the overwhelming weight of the evidence that it was clearly wrong and unjust. We overrule the fourth point of error.

### 2. Excessive Damages

#### a) Legal Insufficiency or No Evidence

■▬ The Thomases' primary expert witness expressed the opinion that Commonwealth's conduct was outrageous. Evidence supported his opinion. The evidence indicated that the wrongful conduct was cumulative and ongoing. There was evidence that Commonwealth's failure to inform the Thomases about the progress and findings of its investigation placed the Thomases at a disadvantage. The jury could have determined that Commonwealth intentionally misled, or withheld information from, the Thomases. Commonwealth's investigation was not consistent with its own policy mandating an objective investigation. Commonwealth reached a premature conclusion adverse to the Thomases' interests and then engaged in a course of conduct designed to justify that conclusion.

This was some evidence to support the jury's finding.

### b) Factual Insufficiency

The jury also heard evidence that displayed Commonwealth's conduct in a more favorable light. The jury determined the weight and the credibility of the conflicting evidence. In view of the evidence, and considering the jury's role as fact finder, we cannot say that the jury's award of exemplary damages was excessive or unsupported by the evidence. Nor was the award unreasonably disproportionate to the amount of actual damages awarded. We overrule the fifth point of error.

### DUE PROCESS

In Commonwealth's eighth point of error, it maintains that the award for exemplary damages unconstitutionally deprives it of property without due process of law. *See* U.S. CONST. amend. XIV; TEX. CONST. art. I, §§ 13 & 19. Commonwealth contends that the exemplary damages award was excessive and disproportionate to the alleged wrong and violated the "excessive fines" provision in article 1, section 13 of the Texas Constitution.

■■■■ The Texas constitutional prohibition against the imposition of excessive fines encompasses civil penalties. *Pennington v. Singleton*, 606 S.W.2d 682, 690 (Tex.1980); TEX. CONST. art. I, § 13. We have already determined that the award was not excessive or disproportionate. The actual damages awarded totaled $708,800. The award of exemplary damages was $2,000,001. The ratio of exemplary to actual damages was approximately three to one. We perceive no basis for declaring that this ratio is disproportionate or excessive. The *Pennington* court determined that statutory liability for treble damages did not violate the excessive fines prohibition. *Pennington*, 606 S.W.2d at 690–91.

■■■ The United States Supreme Court has recently resolved a due process challenge to an award of punitive damages. *Pacific Mut. Life Ins. Co. v. Haslip,* —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Although the imposition of punitive damages in a particular case might be subject to constitutional attack, the common law method of assessing punitive damages is not per se unconstitutional. *Id.* at 1043. The *Haslip* court determined that the total damage award of $1,040,000 included punitive damages of not less than $840,000—a ratio of punitive damages to actual damages of about four to one. *Id.* at 1037 & n. 2. The award did not violate the requirements of due process. *Id.* at 1044. The *Haslip* jury was instructed it could, in its discretion, award punitive damages not as compensation but to punish the defendant and to protect the public by deterring the defendant and others from committing similar wrongs in the future. *Id.* at 1037 n. 1, 1044.

The instructions to the jury below were as follows:

"Exemplary damages" means a discretionary amount awarded to the Plaintiffs that punishes the Defendant and serves as a warning to others situated like the Defendant to avoid committing like offenses or wrongs in the future.

In determining the amount, you may consider—

1. the nature of the wrong,

2. the frequency of the wrongs committed,

3. the character of the conduct involved,

4. the degree of culpability of the wrongdoer,

5. the situation and sensibilities of the parties concerned,

6. the extent to which such conduct offends a public sense of justice and propriety, and

7. the size of the award needed to deter similar wrongs in the future.

This instruction gives more guidance than the *Haslip* instruction. Under these instructions, the jury's award of exemplary damages is less susceptible to a due process challenge than the award involved in *Haslip*. The award of exemplary damages did not violate due process. We overrule the eighth point of error.

## PREJUDGMENT INTEREST

In its sixth point of error, Commonwealth argues that the trial court erred in awarding prejudgment interest because the evidence was either legally or factually insufficient to support the award. Commonwealth asserts that there is no evidence of *when* the Thomases suffered the losses for which they were awarded actual damages.

■ A prevailing plaintiff should be compensated for the defendant's having the beneficial use of damage funds between the time of the injury and the date of the judgment. *See Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 554 (Tex.1985). Prejudgment interest compensates the plaintiff for loss of the opportunity to invest and earn interest on the damage funds. *Matthews v. DeSoto,* 721 S.W.2d 286, 287 (Tex.1986) (per curiam). Awards of prejudgment interest are designed to achieve full compensation for the injured party and to expedite settlements and trials by removing incentives for defendants to delay resolution of disputes. *Cavnar,* 696 S.W.2d at 554.

■ The record shows that counsel for the Thomases used the date of Commonwealth's letter rejecting the Thomases' proofs of loss as the date from which prejudgment interest accrued. We find no evidence connecting that date to the actual damages suffered by the Thomases (lost investment in certain houses, loss of credit, expert witness expenses incurred in the Tarrant County lawsuit, mental anguish, and Roy Thomas's lost income as a bank director). Our search of the record reveals no evidence establishing the dates of the Thomases' losses with respect to the various awards of actual damages. However, we determine that this lack of evidence is not fatal to the Thomases' claim for prejudgment interest.

In tort cases, it may be difficult or even impossible to identify the precise point in time when damages occurred. The *Cavnar* court addressed this issue as follows:

> We recognize that damages are typically incurred intermittently throughout the prejudgment period. This fact complicates the award of prejudgment interest because a plaintiff is not entitled to recover prejudgment interest on damages until those damages have actually been sustained. Until that time, the plaintiff has not lost the use of the money he ultimately receives from the defendant.
>
> Yet a system which would force litigants to determine precisely when each element of a plaintiff's damage award was incurred would impose an onerous burden on both the trial bench and bar.

*Cavnar,* 696 S.W.2d at 555. The *Cavnar* court adopted an arbitrary date of accrual for three tort actions: wrongful death, personal injury, and survival actions—the court held that prejudgment interest would begin to accrue "six months after the occurrence of the incident giving rise to the cause of action." *Id.* at 555.

The Supreme Court of Texas' reasoning is compelling and applicable in this case. Some of the Thomases' damages were suffered intermittently. It would be difficult or impossible to determine exactly when each injury occurred. We determine that application of the *Cavnar* holding in this case strikes the proper balance between the interests of all parties. Accordingly, we hold that the trial court erred only insofar as it calculated prejudgment interest from May 4, 1981, the date of Commonwealth's denial of the Thomases' proofs of loss. Instead, the court should calculate prejudgment interest from six months after the cause of action accrued or from November 4, 1981.

We reverse the trial court's award of $1,000,637.60 in prejudgment interest, and we remand this cause solely for the purpose of recomputing the amount of prejudgment interest to be awarded to the Thomases using an accrual date of November 4, 1981. In all other respects, we affirm the trial court's judgment.